# United States Court of Appeals for the Federal Circuit

2009-8004

CYNTHIA WOODWARD, on behalf of herself
and minor daughter MOLLY WOODWARD,
ASHLEY MARTIN individually and
BRANDON MARTIN individually,

Petitioners,

v.

DEPARTMENT OF JUSTICE,

Respondent.


Tara S. Emory and Joshua B. Smith, Skadden, Arps, Slate, Meagher & Flom, LLP, of Washington, DC, argued for petitioners. With them on the brief were Ross W. Tucker and Nicolas E. Boring.

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With her on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director. Of counsel on the brief were Rafael A. Madan, General Counsel, and Gregory C. Brady and Rosemary Carradini, Deputy General Counsel, Bureau of Justice Assistance, of Washington, DC.

Roncevert Almond, The Wicks Group, PLLC, of Washington, DC, for amicus curiae National Volunteer Fire Council.

On petition from: Bureau of Justice Assistance

# United States Court of Appeals for the Federal Circuit

2009-8004

CYNTHIA WOODWARD, on behalf of herself
and minor daughter MOLLY WOODWARD,
ASHLEY MARTIN individually and
BRANDON MARTIN individually,

Petitioners,

v.

DEPARTMENT OF JUSTICE,

Respondent.

On petition for review of a decision of the Bureau of Justice Assistance in PSOB Claim No. 2004-13.

_____

DECIDED:  March 15, 2010

_____

Before MAYER, FRIEDMAN, and GAJARSA, <u>Circuit Judges</u>.

GAJARSA, <u>Circuit Judge</u>.

Petitioners Cindy Woodward and her children, Ashley Martin, Brandon Martin and minor Molly Woodward ("Petitioners"), are the family of Daniel Neil Woodward, a volunteer firefighter with the Blackman Florida Volunteer Fire Department. Mr. Woodward died in 2001 shortly after fighting a fire. Petitioners submitted a claim to the Bureau of Justice Assistance ("BJA") seeking death benefits under the Public Safety Officers' Benefits Act ("PSOBA"), 42 U.S.C. § 3796.  The BJA Director ("Director") denied Petitioners' claim based on the conclusion that smoke inhalation was not a "substantial factor" in Mr. Woodward's death.  For the reasons stated below, we reverse and remand.

BACKGROUND

On the evening of September 6, 2001, Mr. Woodward reported a fire occurring in the bathroom of his own home. The fire department responded with two fire engines within ten minutes. Mr. Woodward did not have his protective gear with him, but pulled the fire hose from the engine and assisted another firefighter for about fifteen to thirty minutes. After the fire was extinguished, Mr. Woodward walked around the lawn, leaned against his vehicle, and talked on his cell phone with his wife. About half an hour later, Mr. Woodward reported minor chest pain to the emergency medical technician on the scene. Initially, his pain responded to oxygen treatment, but returned several minutes later. Subsequently, Mr. Woodward had a seizure and stopped breathing. He was taken by ambulance to the hospital, but after significant efforts to revive him, he was pronounced dead.

The Florida State Medical Examiner's Office conducted an autopsy. Dr. Michael Berkland, the medical examiner who performed the autopsy, determined that Mr. Woodward died of natural causes. Shortly thereafter, the State of Florida completed an investigation of Dr. Berkland and found he had falsified several autopsy reports, including that of Mr. Woodward. The investigation revealed that the toxicology evidence cited by Dr. Berkland, allegedly showing no smoke inhalation, was entirely fabricated. The toxicology tests were never requested or performed. The State of Florida disciplined Dr. Berkland and amended Mr. Woodward's autopsy report to find that he died of probable smoke inhalation.

Before Dr. Berkland's falsification was discovered, the National Institute for Occupational Safety & Health ("NIOSH") had issued a report regarding Mr. Woodward's death. The report relied on medical conclusions consistent with the falsified findings of

Dr. Berkland. The report also contained discussion of interviews of eyewitnesses by an independent investigator. It did not state whether any firefighters reported that Mr. Woodward inhaled smoke during the incident. After discovering Dr. Berkland's falsification of the autopsy report, NIOSH retracted the 2002 report and issued a revised report. The revised report advises that Mr. Woodward's cause of death cannot be determined with certainty, and speculates that one possible cause was smoke inhalation "either by itself or as a triggering agent for a heart attack or a cardiac arrhythmia." It also states that at least one firefighter reported that Mr. Woodward inhaled smoke during the fire, and notes that Mr. Woodward's electrocardiogram was not consistent with a heart attack. Due to the fact that Mr. Woodward's remains were cremated upon his death, it is impossible to perform a new autopsy to determine his cause of death with certainty.

On October 31, 2003, Petitioners filed a claim for death benefits with the Public Safety Officers' Benefit Office ("Office"). On February 9, 2004, the Office denied the claim concluding that Mr. Woodward's death was not a result of a personal injury covered by the PSOBA, but was the result of preexisting coronary artery disease. Petitioners then requested a hearing officer review of their claim. Petitioners waived their right to a hearing before an independent hearing officer, but submitted affidavits in support of their claim.

Petitioners submitted affidavits from Kenneth Finkel, the Fire Chief, Stephen Marcotte, a member of the fire department, and Larry Matthews, the emergency medical technician who treated Mr. Woodward on the night of his death. Petitioners also submitted declarations from two physicians, Dr. DeSimone and Dr. Picketing, who provided medical opinions regarding the cause of Mr. Woodward's death. The two

physicians opined that, considering the evidence other than the autopsy report, it was "impossible" to determine the cause of Mr. Woodward's death. Nonetheless, both physicians concluded that smoke inhalation was a "substantial factor" in Mr. Woodward's death. After reviewing Petitioners' evidence, the hearing officer determined that Mr. Woodward's death was not covered by the PSOBA. The hearing officer found that "the weight of the evidence shows that VFF Woodward had only been exposed to smoke for a short time, and for the next half-hour he did not show any respiratory effects of carbon monoxide inhalation as he engaged in salvage and overhaul activities."

On October 20, 2006, Petitioners appealed the hearing officer's determination to the Director and sought to introduce new evidence. Petitioners submitted the amended autopsy report, death certificate, and related documents. Given the unusual circumstance of an amended autopsy report and death certificate, the Director suggested remanding the case to a hearing officer for consideration of additional evidence. Petitioners waived their right to a new hearing, explaining that "additional factual discovery could not affect the result of the Final Agency Determination." Accordingly, the Director considered the claim for a final determination based on the existing evidence in the record.

On October 28, 2008, the Director issued a final determination denying benefits. The Director found it more likely than not that Mr. Woodward died as a result of atherosclerotic cardiovascular disease. Although the Director acknowledged that the original autopsy was no longer credible, he found the Woodward family did not sufficiently prove that Mr. Woodward died of smoke inhalation. The Director relied almost entirely on the NIOSH report, despite the fact that the report relied on

Dr. Berkland's falsified autopsy. Moreover, the Director applied 28 C.F.R. § 32.4 (2007), a regulation implemented in 2006 which provides a more burdensome standard of proof for certain aspects of claims made under the amended version of the PSOBA. Thus, Petitioners were denied the death benefits due to their inability to produce certain medical evidence, which is unavailable as a result of Dr. Berkland's misconduct.

Petitioners timely appealed the Director's determination. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

The PSOBA provides death and education benefits to survivors of public safety officers killed in the line of duty. To qualify for benefits, a petitioner must show that "a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a). In this case, the Director was required to determine whether Mr. Woodward suffered a "personal injury" as defined by the PSOBA. If the stress associated with fighting the fire was the proximate cause of Mr. Woodward's heart attack, the death is excluded from the PSOBA's coverage. However, if smoke inhalation was a substantial factor in triggering Mr. Woodward's heart attack, then it constitutes a "personal injury" covered by the PSOBA. Ultimately, the Director concluded that the evidence on the record showed that Mr. Woodward died of a heart attack, not smoke inhalation.

In 2003, when the Woodward family first filed its claim, the following regulation was in effect: "[T]he [BJA] shall resolve any reasonable doubt arising from the circumstances of the officer's death . . . in favor of payment of the death . . . benefit." 28 C.F.R. § 32.5(a) (1999) ("original regulation"). In 2006, during the pendency of the Woodward's appeal, the federal regulations were amended. The amended regulations

were intended to implement the Hometown Heroes Act of 2003 ("HHA"), which creates a presumption that the benefit must be paid to the family of any public safety officer who dies within twenty-four hours of engaging in non-routine activity in the line of duty, without regard to whether there was a traumatic personal injury. 42 U.S.C. § 3796 (2004). The HHA presumptively permits death benefits in cases where a safety officer suffers a heart attack while engaged in fire suppression, but it is not retroactive. Most notably, the amendment changed a petitioner's burden of proof for a claim brought pursuant to the PSOBA: "a claimant has the burden of persuasion as to all material issues of fact, and by the standard of proof of 'more likely than not.'" 28 C.F.R. § 32.5 (2007) ("amended regulation"). The amended regulations took effect in August 2006, about three years after the Woodward family filed their claim. During their appeal, the Director required the Woodward family to carry the burden of proving Mr. Woodward's personal injury by a "more likely than not" standard.

Petitioners assert that the BJA incorrectly applied the amended regulation during their appeal, changing their burden of proof midstream through the agency proceedings. Petitioners argue that application of the amended regulation is strongly disfavored in this case because it represents a significant change in the burden of proof. In Princess Cruises v. United States, we found that a change in evidentiary presumption resulted in a significant change in the law, disfavoring retroactive application of the new law. 397 F.3d 1358, 1364 (Fed. Cir. 2005). In this case, the amended regulation changed the burden of proof from a lenient standard resolving any reasonable doubt in favor of the claimant to the more stringent standard requiring that a claimant prove all material issues of fact by a "more likely than not" standard. This is a significant change in the law that disfavors retroactive application of the amended regulation.

Petitioners further argue that retroactive application of an amended regulation is disfavored where claimants made strategic decisions in reliance on the old standard, before the new standard existed. See id. at 1366. We agree. Petitioners made strategic decisions in reliance on the "reasonable doubt" burden of proof. Petitioners waived the remand hearing, believing that the evidence on the record was sufficient to show that Mr. Woodward died of smoke inhalation. Moreover, Petitioners chose not to supplement the record upon learning that the initial autopsy report was falsified, believing that the evidence before the Director was sufficient to satisfy the original burden of proof. When the BJA changed Petitioners' burden of proof during the course of their appeal, Petitioners had no opportunity to introduce additional evidence to satisfy the heightened burden of proof.

## CONCLUSION

Accordingly, we reverse and remand the case for application of the original regulation to Petitioners' appeal.

### REVERSED and REMANDED.

## COSTS

Costs to Petitioners.